**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JERAMIE YATES, ANGELA
DEE YATES and GARY DEAN
YATES,

               Plaintiffs,                            CASE NO. 11-10778
                                                HON. LAWRENCE P. ZATKOFF

v.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee, and WELLS FARGO BANK, N.A.,
d/b/a AMERICA'S SERVICING COMPANY,

               Defendant.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on the 10th day of December, 2012

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment (Docket #44).

The Motion for Summary Judgment has been fully briefed.[1]   The Court also must address

Defendants' Objections to the Magistrate's Order Regarding Discovery (Docket #45), which also

has been fully briefed, and Defendants' Motion for Stay of Effect of Magistrate's Order (Docket

#51). The Court finds that the facts and legal arguments pertinent to the motions are adequately

presented in the parties' papers, and the decision process will not be aided by oral arguments.

_____

[1]Plaintiffs' *Ex Parte* Motion to File a Brief Exceeding 20 Pages (Docket #49) is GRANTED.

Therefore, pursuant to E.D. Mich. Local R. 7.1(f)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted by the parties, without this Court entertaining oral arguments.  For the reasons that follow, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART and Defendants' Objections to the Magistrate's Order Regarding Discovery and Motion for Stay of Effect of Magistrate's Order are DENIED.

## II.  BACKGROUND

### A.    Creation of the Home Affordable Modification Program

Congress enacted the Emergency Economic Stabilization Act of 2008 (the "Act") in response to the foreclosure crisis. The purpose of the Act is to grant the U.S. Secretary of Treasury authority to restore stability to the financial system and ensure that such authority is used in a manner that "preserves homeownership." The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program ("TARP"). 12 U.S.C. §5201. Under TARP, the Secretary created the Making Home Affordable Program a/k/a/ Home Affordable Modification Program ("HAMP") to help at-risk homeowners avoid foreclosure.

A HAMP modification consists of two stages. First, a participating servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP"). The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided. If the homeowner executes the TPP Agreement, complies with all the documentation requirements, and makes all three TPP monthly payments, the second stage of the HAMP process is triggered and the homeowner is offered a permanent modification.

2

Defendant Wells Fargo Bank, N.A. ("Wells Fargo") signed a "Servicer Participation Agreement for the Home Affordable Modification Program" with Fannie Mae. Once Wells Fargo signed its contract with Fannie Mae to participate in HAMP, Wells Fargo was required to review all mortgage loans that are in default or in imminent risk of default for a possible modification.

**B.      Plaintiffs' Loan Modifications**

Plaintiffs Angela Yates and Gary Yates (wife and husband) and Jeramie Yates (son of Angela and Gary Yates) reside at 7030 Textile, Ypsilanti, MI 48197. Plaintiffs purchased the home in 1983. In February 2005, Gary Yates suffered a stroke, which severely disabled him and caused the closing of the family business and accumulation of significant medical debts. In November 2005, Jeramie Yates obtained a loan from BNC Mortgage, Inc. in the amount of $196,000. The mortgage was later assigned to Defendant U.S. Bank National Association ("U.S. Bank"), and Wells Fargo serviced the loan for U.S. Bank through its servicing division, America's Servicing Company ("ASC"). The loan had an adjustable interest rate, such that the initial payments were approximately $1,400 per month. Once the interest rate increased and the payments exceeded $2,000 per month, Plaintiffs could no longer afford the payments. In 2008, Plaintiffs' loan went into default, and in April 2008, Defendants posted and published notice of a foreclosure sale scheduled for May 8, 2008. In May 2008, Plaintiffs applied for a loan modification and the May 8, 2008, foreclosure sale was adjourned.

In April 2009, Defendants offered Plaintiffs a loan modification, which Plaintiffs accepted (the "April 2009 Modification Agreement"). The April 2009 Modification Agreement was executed by all three Plaintiffs and a representative of Wells Fargo. The April 2009 Modification Agreement required Plaintiffs to make: (a) an initial payment of $3,868.37, to be applied to the delinquency, and

3

(b) monthly payments of approximately $1,403.58, plus escrow payments for taxes and insurance, beginning on July 2, 2009.  Plaintiffs failed to make the first payment of $3,868.37 within 5 days of the April 15, 2009, the day Plaintiffs executed the April 2009 Modification Agreement, as required thereunder.  Instead, Plaintiff made a payment of $3,128.52–more than $700 less than was required–via a check dated June 1, 2009.   This is the amount that, at her deposition, Angela Yates testified she was told to pay by an ASC representative when they spoke on the phone.  ASC cashed Plaintiffs' check for the lesser amount, and ASC subsequently executed the April 2009 Modification Agreement on June 6, 2009.  Plaintiffs never paid Wells Fargo any of the $1,403.58 monthly payments required under the April 2009 Modification Agreement.

According to the deposition testimony of Angela Yates, before the first April 2009 Modification Agreement payment was due on July 1, 2009, ASC told Plaintiffs that they might be eligible for a new modification, with better terms, under HAMP. Plaintiffs state that they were advised by ASC to: (a) not submit the July payment under the April 2009 Modification Agreement, but (2) instead submit a new packet and application for the HAMP program.  ASC received the HAMP application from Plaintiffs, including the IRS 4506-T (Request for Transcript of Tax Return), on or about July 31, 2009.  On August 22, 2009, ASC determined that Plaintiffs qualified for the 90-Day HAMP Trial, with monthly payments of $861.79.  Soon thereafter, Plaintiffs received from ASC a letter dated August 22, 2009 (the "Letter"), wherein ASC stated that Plaintiffs were awarded a TPP and that the first of three payments required thereunder was due October 1, 2009.  The Letter states, "You did it! By entering into a Home Affordable Modification Trial Period Plan you have taken the first step toward making your payment more affordable." The Letter was signed electronically by ASC.

The TPP agreement ASC sent to Plaintiff (hereinafter, the "Plan") is a four-page document entitled "HOME AFFORDABLE MODIFICATION PROGRAM LOAN TRIAL PERIOD (Step One of Two-Step Documentation Process)."  The Trial Period Effective Date under the Plan was defined as October 1, 2009.  The parties rely on the following provisions of the Plan:

> If I am in compliance with this Loan Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement (Modification Agreement), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. . . .

> I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

> * * * *

> 2.   **The Loan Trial Period.** On or before each of the following due dates, I will pay the Lender the amount set forth below $861.79, which includes payment for Escrow items, including real estate taxes, insurance premiums and other fees, if any, of U.S. $374.28.

> * * * *

> A.   TIME IS OF THE ESSENCE under this Plan;

> * * * *

> F.   If prior to the Modification Effective Date,[2] (i) the Lender does not provide me a fully executed copy of the Plan and the Modification Agreement; . . . the Loan Documents will not be modified and this Plan will terminate.

---

[2]This term is not defined in the Plan.

5

G.    I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed.

\* \* \* \*

3.    **The Modification.** I understand that once Lender is able to determine the final amounts of unpaid interest and any other delinquent amounts (except late charges) to be added to my loan balance and after deducting from my loan balance any remaining money held at the end of the Trial Period under Section 2.D. above, the Lender will determine the new payment amount. If I comply with the requirements in Section 2. and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents….

Plaintiffs signed and returned the Plan on September 30, 2009.  Plaintiffs acknowledge they never received a copy of the Plan executed by ASC.

Plaintiffs made all three required Plan payments to ASC, in October, November and December 2009.  Angela Yates, who handled all of the financial paperwork for the family, testified at her deposition that she repeatedly submitted via fax to ASC all information requested by ASC, including income verifications for all Plaintiffs.  In January 2010, Plaintiffs made another monthly payment in the same amount and received a letter from ASC, dated December 29, 2009, which stated that Plaintiffs had to submit more updated documents to ASC.  Angela Yates complied by faxing the requested information to ASC, as reflected by the January 15, 2010, log notes for Plaintiffs' account in ASC's system.  Those notes stated: "ALL APPLICABLE DOCS RECEIVED."

According to the ASC log notes for Plaintiffs' account, on or about January 26, 2010, ASC reviewed the Plaintiffs' eligibility for the permanent HAMP modification and determined that

6

Plaintiffs were not eligible.  Apparently, ASC did not notify Plaintiffs of that decision at that time.

Instead, on February 8, 2010, ASC advised Angela Yates to "FAX CURRENT H/L, F/W, & POI

FOR ALL SOURCES."[3]  On February 9, 2010, ASC accepted another Plan payment from Plaintiffs

over the phone, and ASC continued to accept such monthly Plan payments from Plaintiffs in March,

April and May 2010.  During that time period, Plaintiffs received neither a permanent loan

modification nor a written notice that their request of permanent modification had been denied.

In a letter dated May 11, 2010 (which makes no reference to HAMP), ASC notified Plaintiffs

that ASC was "unable to get [Plaintiffs] to a modified payment amount that [they] could afford

based on [their] monthly income of $000.00 and your monthly expenses of $3,489.51."  According

to Plaintiffs, however, their aggregate income: (a) was not "$000.00," as the May 11, 2010 letter

states, and (b) had not changed since their Plan review, as evidenced by the numerous income

verifications they had sent to ASC.  Angela Yates testified that when she received the May 11, 2010

letter: (1) she contacted ASC immediately, (2) ASC asked for updated information for another

review, and (3) she "sent in whatever they asked [her] to."  Plaintiffs believed that they were going

to be re-reviewed by ASC because of the error regarding their income.  ASC's log notes for

Plaintiffs' account dated May 27, 2010, demonstrate why Plaintiffs had that belief.  The May 27,

2010 log notes state, "A3P CLLED TO CK STATUS OF RVW ADV STILL IN RVW" (authorized

third party [Angela Yates] called to check on status of review, advised still in review).

On the same day Angela Yates called ASC and was told Plaintiffs' requested modification

was still under review (May 27, 2010), Plaintiffs' home was sold at a foreclosure sale.  The

---

[3]Neither party supplied the Court with a key for interpreting symbols, acronyms, etc. used in
ASC's log notes.

redemption period on Plaintiffs' home expired on November 27, 2010. Plaintiffs claim that they did not learn of the foreclosure sale of their home until December 2010, when a real estate agent notified Plaintiffs that they needed to vacate the property. It is undisputed that Defendants published and posted notice of the sale in April 2008, but Plaintiffs claim Defendants have failed to provide any proof in the record of *any* week by week adjournments, and certainly no records of such adjournments for the entire two-year period between the original notice and sale. An affidavit filed by Defendants' agent, an attorney at Trott & Trott, a Michigan foreclosure firm ("Trott"), affirms that Trott requested that the sale be adjourned on a consecutive week by week basis by the Washtenaw County Sheriff from May 8, 2008 though May 27, 2010, and that the Trott attorney believes that the Washtenaw County Sheriff did so.[4]  Angela Yates also has testified that ASC advised her that they would notify Plaintiffs before any foreclosure sale, but no such notification occurred.

In December 2010, after the redemption period expired, Defendants commenced a summary proceeding (a post-redemption eviction case) in 14-B District Court, in Washtenaw County. On January 25, 2011, Plaintiffs filed a four-count complaint in Washtenaw County Circuit Court, and Defendants removed the circuit court case to this Court on February 25, 2011. Plaintiffs' Amended Complaint alleges claims for: (1) breach of contract (Count I), (2) promissory estoppel (Count II), (3) violation of the Mortgage Brokers, Lenders and Servicers Act (Count III), and (4) failure to provide proper notice of foreclosure, in violation of M.C.L. § 600.3208 (Count IV). Plaintiffs now concede that Count III is not a viable claim. Plaintiffs seek, among other things: (a) to set aside the

---

[4]At the time the parties filed their briefs, the records of adjournments for all foreclosure sales held in Washtenaw County during the relevant time period were incomplete. No updated information regarding this matter has been provided to the Court.

8

foreclosure sale, (b) an award of actual and compensatory damages, and (c) to require Defendants

to fulfill their "obligations under the contract and reform the mortgage to reflect the modified

terms." The summary proceeding case in 14-B District Court was stayed after Plaintiffs filed this

action, and it remains stayed.

### III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language

of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits
> or declarations, stipulations (including those made for purposes of the
> motion only), admissions, interrogatory answers, or other materials;
> or
>
> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine

dispute as to a material fact, and all inferences should be made in favor of the nonmoving party.

*Celotex*, 477 U.S. at 323. The moving party discharges its burden by "'showing'–that is, pointing

9

out to the district court–that there is an absence of evidence to support the nonmoving party's case."
*Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

# IV.  ANALYSIS

As this case was filed in a state court in Michigan and removed on the basis of diversity, the Court applies Michigan substantive law when considering the summary judgment motion. *See, e.g., NILAC Int'l Mktg. Group v. Ameritech Servs., Inc.*, 362 F.3d 354, 368 (6th Cir. 2004); *Bolone v Wells Fargo Home Mortg., Inc.*, 2012 U.S. Dist. LEXIS 34272 (E.D. Mich. Mar. 14, 2012).

## A.    Plaintiffs Have Standing

Defendants first assert that Plaintiffs lack standing to bring this action, primarily because the redemption period has expired.  Pursuant to well-established Michigan law, however, a homeowner may challenge a foreclosure by advertisement after the redemption period has expired. As the Michigan Court of Appeals explained nearly 30 years ago:

> The Supreme Court has long held that the mortgagor may hold over after foreclosure by advertisement and test the validity of the sale in the summary proceeding. *Reid v Rylander*, 270 Mich 263, 267; 258 NW 630 (1935); *Gage v Sanborn*, 106 Mich 269, 279; 64 NW 32

10

> (1895). Otherwise, the typical mortgagor who faces an invalid foreclosure would be without remedy, being without the financial means to pursue the alternate course of filing an independent action to restrain or set aside the sale. *Reid,* supra, p 267; see also, 16 Michigan Law and Practice, Mortgages, § 174, pp 438-439. The mortgagor may raise whatever defenses are available in a summary eviction proceeding. MCL 600.5714; MSA 27A.5714; *Federal National Mortgage Ass'n v Wingate*, 404 Mich 661, 676, fn 5; 273 NW2d 456 (1979).

*Manufacturers Hanover Mtg. Co. v. Snell*, 142 Mich.App. 548, 553-54 (1985). *See also Nett v. Wells Fargo Bank, N.A.*, 2011 WL 1519166 (E.D. Mich. April 20, 2011) ("alleged irregularities . . . and other reasons . . . for setting aside the foreclosure" give plaintiffs standing to challenge the foreclosure and/or sheriff's sale); *United States v. Garno*, 974 F.Supp. 628, 633 (E.D. Mich. 1997) ("a very good reason" may dictate setting aside a foreclosure sale). *Accord Markoff v. Tournier*, 229 Mich. 571 (1925) (a foreclosure sale may be set aside for fraud or irregularity).

Defendants argue that, because Plaintiffs are not challenging the foreclosure in the summary proceeding in 14-B District Court, the cases Plaintiffs rely on, namely *Snell*, do not support Plaintiffs' argument that they have standing.  To the extent Defendants argue that this case differs from the summary proceeding cases (*i.e.*, that Plaintiffs are not testing the validity of the sale **in** the summary proceeding action), the Court finds their argument misplaced.  In the present case, Defendants initiated a summary proceeding in 14-B District Court.  As such, as set forth in *Snell*, Plaintiffs had a *right* to raise defenses as a defendant in that summary proceeding.  As noted by the *Snell* court, that is generally the avenue utilized by a mortgagor because the mortgagor would not have the financial resources to bring a separate action.  Contrary to the suggestion of Defendants, however, nothing in the *Snell* opinion: (1) *obligates* a mortgagor to contest the foreclosure solely by raising defenses in the summary proceeding, or (2) prevents or precludes a mortgagor from filing

11

a separate action in another court, as Plaintiffs have done here.  Likewise, as discussed in Section IV.B. below and consistent with *Snell*, *Nett*, and *Markoff*, Plaintiffs have alleged and proffered sufficient evidence from which reasonable jurors could find irregularities and/or fraud with respect to Defendants' handling of the Plan and failure to award Plaintiffs a permanent modification.

Accordingly, and for the foregoing reasons, the Court concludes that Plaintiffs have standing to proceed with this cause of action.

**B.**     **Breach of Contract (Count I)**

For Plaintiffs to state a breach of contract under Michigan law, they first must establish that the Plan satisfies the essential elements of a contract. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).  The essential elements of a valid contract are that there be: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Hess v. Cannon Twp.*, 265 Mich.App 582, 592 (2005) (citation omitted). Then, after showing that a valid, binding contract exists, Plaintiffs must show: (a) the terms of the contract, (b) a breach of one or more of those terms by Defendants, and (c) injury to Plaintiffs caused by Defendants' breach.  *Timmis v. Suzler Intermedics, Inc.*, 157 F. Supp. 2d. 775, 777 (E.D. Mich. 2001) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)).

*1.     Evidence of a Valid Contract*

Defendants contend that Plaintiffs' breach of contract claim must be dismissed, as a matter of law, because the explicit language of the Plan clearly and unambiguously provides that: (1) it had to be signed by ASC, and (2) it had to be delivered to Plaintiffs before it became effective.  Further, Defendants argue that Plaintiffs acknowledged that there was no contract between the parties when Plaintiffs signed the Plan, which included the following language:

12

> I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until … (ii) I receive a fully executed copy of a Modification Agreement[.]

Thus, Defendants argue, as the Plan was never signed by ASC (nor an executed copy of the Plan delivered to Plaintiffs), Defendants never entered into a valid, binding contract with Plaintiffs.

Plaintiffs argue that the Plan contained all the requirements of an enforceable offer because it contained unequivocal terms that left nothing for the parties to negotiate.  Plaintiffs note that the first sentence of the Plan provides:

> If I am in compliance with this Trial Period Plan and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement[.][5]

Thus, Plaintiffs believe that the Plan's first sentence manifests a willingness of ASC to enter into a bargain, and Plaintiffs' assent would conclude that agreement, *i.e.*, if Plaintiffs complied with the terms of that agreement, Defendants would provide them with a permanent modification.  Plaintiffs further argue that the Plan constitutes an "Offer," as evidenced by the following Plan language (emphasis by Plaintiffs):

> If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income . . . to determine whether I qualify for the *offer* described in this Plan (the "*Offer*"). I understand that after I sign and  return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the *Offer* or will send me written notice that I do not qualify for the *Offer*.

As such, Plaintiffs conclude that the language in the Plan constitutes an unequivocal binding offer.

---

[5]As defined in the Plan, "I" or "me" means Plaintiffs and "Lender" means ASC.

13

In reviewing the relevant case law on this issue, the Court finds that the instant case involves largely the same TPP language and the same arguments regarding the absence of a binding contract that were present in *Darcy v. Citifinancial, Inc.*, 2011 WL 3758805 (W.D. Mich. August 25, 2011). Notably, Defendants make the same argument made by the lender defendants in *Darcy*:

> Defendants . . . argue that Plaintiff cannot claim breach of contract because the TPP was not a binding contract as a matter of law. They characterize the TPP as step one of a two-step process and claim that it did not result in an executed contract.

In *Darcy*, as Plaintiffs have in this case, the plaintiff alleged that: (1) defendants offered a TPP as step one in the HAMP program, (2) defendants sent the form agreement to plaintiff for her signature, (3) the plaintiffs signed the TPP and returned two copies to the lender, and (4) the plaintiff made the monthly payments required by the TPP for (at least) the requisite three-month period. On that basis, the *Darcy* court concluded that the TPP agreement was a contract, even though the TPP not signed by the defendant lender in that case. *Darcy*, 2011 WL 3758805, at *6. The *Darcy* court is not the only court that has recognized that a TPP agreement constitutes a valid contract, even when the TPP is not signed by the lender. *See e.g., Belyea v. Litton Loan Serv., LLP*, 2011 WL 2884964 (D. Mass. July 11, 2011).[6]

The Court finds persuasive the analysis of the *Darcy* court. In presenting Plaintiffs with the Plan, Defendants unilaterally extended to Plaintiffs an opportunity to undertake a trial period to make the payments required under the Plan (as well as comply with the other terms of the Plan). In the first sentence of the Plan, a document Defendants drafted and voluntarily presented to

---

[6]The Court also notes that a federal district court in Massachusetts, after considering a lenders' argument that a TPP was not an enforceable offer, stated that "it is plain that the TPPs were offers." *Bosque v Wells Fargo Bank,* 762 F.Supp.2d 342, 351 (D. Mass. Jan. 26, 2011).

14

Plaintiffs, ASC [Lender] represented to Plaintiffs [I/me] that ASC would provide Plaintiffs with a Loan Modification Agreement if Plaintiffs complied with the terms of the Plan:

> If I am in compliance with this Trial Period Plan and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement[.]

Accordingly, the Court finds that, when viewing the facts in a light most favorable to Plaintiffs, once Plaintiffs signed the Plan, Plaintiffs accepted Defendants' offer. Therefore, the Court concludes that there was a mutuality of agreement and a mutuality of obligation of the parties. As the parties do not dispute that any of the other three elements of a valid, binding contract exist in this case, the Court concludes that there is sufficient evidence in the record to support a finding that the Plan constitutes a valid, binding contract between the parties.

Defendants also assert that, under Michigan law, the statute of frauds requires that the financial institution against whom the document is to be enforced (*i.e.*, ASC) *must* have signed the document. *See*, M.C.L. § 566.132(2); *Crown Tech. Park v. D&N Bank, F.S.B.*, 242 Mich.App. 538, 548 (2000). While the Michigan statute cited by Defendants is unambiguous and *Crown Tech* is a well-reasoned opinion, the Court is not persuaded that this matter is governed by M.C.L. § 566.132(2) or *Crown Tech*. First, the Court does not find *Crown Tech* analogous to this case. Unlike this case, *Crown Tech* involved only an alleged oral promise to modify a loan by waiving a prepayment penalty–there were no written documents at all. *See Crown Tech*, 242 Mich.App. at 547. Second, in this case, Plaintiffs are not relying on any oral promises by Defendants but rather a written document, *i.e.*, the Plan, which, in a light most favorable to Plaintiffs, contains all of the terms necessary for a binding contract. Therefore, as there is evidence from which a jury could find

15

a valid contract between the parties (because Defendants made an offer that Plaintiffs accepted), the Court concludes that Defendants' statute of frauds defense fails.

2.      *Evidence of a Breach of Contract*

Defendants state, "A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be enforced as written." *Rory v. Continental Ins. Co.*, 473 Mich. 457, 467 (2005). As such, courts cannot simply ignore portions of a contract in order to declare an ambiguity. Instead, contracts must be "construed so as to give effect to every word or phrase as far as practicable." *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 467 (2003) (citing *Hunter v. Pearl Assurance Co., Ltd*, 292 Mich. 543, 545 (1940)).  In this case, the Court's adherence to this principle precludes summary judgment on Plaintiffs' breach of contract claim.

As set forth in Section II., and as discussed in Section IV.A., above, the Plan contains a number of internally inconsistent provisions.  Defendants direct the Court to numerous provisions of the Plan that require ASC to sign and return an ASC-executed copy of the Plan to Plaintiffs. *See* Preamble paragraph 2, Section 2.F. and Section 2.G.  Plaintiffs direct the Court to those provisions of the Plan that state that Defendants will provide Plaintiffs with a permanent modification if Plaintiffs fulfill their obligations set forth in the Plan. *See* Preamble paragraph 1 and Section 3.

In the event Defendants persuade the jury that the Plan provisions upon which Defendants rely should govern the parties' relationship, Defendants may prevail if a jury agrees that: (a) the Plan did not become binding until such time as ASC Fargo signed the Plan and returned an ASC-executed copy to Plaintiffs, or (b) even if the Plan became a valid contract once Plaintiffs signed it, Plaintiffs were not entitled to (or did not satisfy the requirements for) a permanent modification.  There is sufficient evidence in the record to support each of those positions.  On the other hand, if Plaintiffs

16

persuade the jury that the Plan provisions upon which Plaintiffs rely should govern the parties'

relationship, Plaintiffs may prevail if a jury agrees that: (1) the parties entered into a binding

agreement, (2) Plaintiffs were entitled to a permanent modification pursuant to such agreement,[7] (3)

Defendants breached the terms of that agreement, and (4) Defendants' breach of that agreement

resulted in an injury to Plaintiffs.  There also is sufficient evidence in the record to support each of

those positions.

Accordingly, the Court finds that:

> While both parties try to isolate the terms that support their
> interpretation, when read as a whole, the [Plan] document is far from
> clear.  The parties' attempts to support their positions with references
> to portions of the agreement highlight the fact that some of the terms
> conflict with others.  While this Court is mindful that it should strive
> to harmonize the terms of the [Plan], [*Wonderland Shopping Ctr.
> Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085,
> 1092 (6th Cir. 2001)], the Court must "give effect to every word,
> phrase, and clause in a contract and avoid an interpretation that would
> render any part of the contract surplusage or nugatory." *Klapp*, 468
> Mich. at 468.  The terms of the [Plan] cannot be read "in reasonable
> harmony" and its language is, thus, ambiguous. *See id*.  Plaintiff[s']
> breach of contract claim hinges on ambiguities in the contract and
> precludes dismissal as a matter of law.

*Darcy*, 2011 WL 3758805, at *6 (footnote omitted).

*3. Conclusion*

---

[7]Numerous courts have concluded that, if a mortgagor complies with the terms of a TPP, the
lender/servicer must grant the mortgagor a loan modification. *See, e.g., Williams v. Geithner*,
2009 WL 3757380, at *3 (D. Minn. Nov. 9, 2009). The *Williams* court, interpreting HAMP rules,
recognized that servicers (lenders) evaluate borrower eligibility prior to the offer of a TPP
Agreement and that compliance with an accepted TPP Agreement mandates a permanent
modification: "If the loan qualifies for a modification after consideration of all the [eligibility]
factors, the servicer is obligated to provide a trial period loan modification. If the borrower
remains current throughout the trial period, the servicer must then provide a loan modification."
*Id*. at *3.

For the reasons set forth above, the Court finds that there is a genuine dispute as to the material facts central to Plaintiffs' breach of contract claim. Therefore, the Court concludes that Defendants are not entitled to summary judgment on Count I.

**C.     Promissory Estoppel (Count II)**

Plaintiffs allege that because, among other things: (1) ASC advised Angela Yates that ASC would notify Plaintiffs before any foreclosure sale took place, and (2) Defendants failed to properly notify Plaintiffs of the foreclosure sale, Plaintiffs chose not to seek refinancing from other sources and lost all opportunities to redeem the home or pursue a short sale. In other words, Plaintiffs contend that they reasonably relied on ASC's representations to their detriment.

Defendants argue that Plaintiffs' promissory estoppel claim is barred by the statute of frauds. Specifically, Defendants rely on M.C.L. § 566.132(2), which provides that an action cannot be brought against financial institutions such as Defendants unless the relevant contract or promise is in writing. As set forth above, Defendants contend that there is no relevant written contract or written promise in this matter because ASC never signed the Plan. As the Court concluded above, however, there is a genuine issue of material fact as to whether the Plan, a written document, constitutes a valid and binding agreement. Therefore, the Court concludes that Plaintiffs' promissory estoppel claim (Count II) is not subject to dismissal at the summary judgment stage.

**D.     Failure to Provide Proper Notice of Foreclosure Sale (Count IV)**

In Michigan, the burden of proof is upon the party who attempts to impeach the statutory foreclosure sale. *See United States v. Garno*, 974 F.Supp. 628, 633 (E.D. Mich. 1997), citing *Markoff*, 229 Mich. at 575.

      *1.     Compliance with M.C.L. § 600.3220*

18

The requirements for foreclosing by advertisement in Michigan are set forth in M.C.L. § 600.3201 et seq. Sections 600.3208, 600.3212, and 600.3216 set forth the basic requirements for the notice, publication and posting of it, and the place and manner of the sale. It is undisputed that Defendants satisfied all notice requirements regarding the foreclosure sale that was scheduled for May 8, 2008, including posting a notice of the foreclosure sale on the door of Plaintiffs' home on April 14, 2008.

Adjournments of a foreclosure sale are governed by M.C.L. § 600.3220, which states:

> Such sale may be adjourned from time to time, by the sheriff or other officer or person appointed to make such sale at the request of the party in whose name the notice of sale is published by posting a notice of such adjournment before or at the time of and at the place where said sale is to be made, and if any adjournment be for more than 1 week at one time, the notice thereof, appended to the original notice of sale, shall also be published in the newspaper in which the original notice was published, the first publication to be within 10 days of the date from which the sale was adjourned and thereafter once in each full secular week during the time for which such sale shall be adjourned. No oral announcement of any adjournment shall be necessary.

"Thus, under Michigan law, an adjournment of one week or less is valid if notice of the adjournment is posted before or at the time of the sale and at the place where the sale is to be made. If the adjournment is for more than one week, however, notice must also be published in the newspaper in which the original notice was published[.]" *Bramlage v. Wells Fargo Home Mortg., Inc.*, 144 Fed.Appx 489, 491 (6th Cir. 2005).

In this case, the original scheduled foreclosure sale date was May 8, 2008, but the foreclosure sale did not take place until May 27, 2010, over two years later. As noted above, Defendants represent that their agent (Trott) asked the Washetnaw County Sheriff to adjourn the foreclosure sale from week to week and Trott believes that such week to week adjournments occurred. Defendants

19

have not submitted such weekly notices to the Court, however, apparently because the records of adjournments for foreclosure sales in Washtenaw County remain incomplete (as they were at the time Defendants filed their briefs).  On the other hand, Plaintiffs have testified that they were not aware that the foreclosure sale was going to take place until more than six months after the sale occurred.

The Court also finds significant the fact that over two years elapsed between the original scheduled foreclosure sale date (May 8, 2008)– a sale for which notice was published and posted at Plaintiffs' home in April 2008 (as well as in the newspaper and at the county courthouse)–and the date of the actual foreclosure sale (May 27, 2010).  There is no evidence that the notice was published and posted at Plaintiffs' home at any time after April 2008, though it should be noted that Defendants had no statutory obligation to do so.  During that two-year period: (1) Defendants offered Plaintiff two loan modifications, including the Plan at issue here, (2) Defendants provided no other notice of foreclosure to Plaintiffs, (3) an ASC representative told Angela Yates that ASC would notify Plaintiffs before any foreclosure sale, and (4) ASC's servicing notes for May 27, 2010, the date of the foreclosure sale, state: "A3P CLLED TO CK STATUS OF RVW ADV STILL IN RVW" (authorized third party called to check on status of review, advised still in review).  The Court finds that any reasonable jury is likely to wonder: "If ASC's representative still believed that Plaintiffs' modification was being reviewed *on the same day Plaintiffs' home was sold at a foreclosure sale*, how or why would Plaintiffs know that the foreclosure sale was taking place?"

For all of the reasons set forth above, when the evidence is viewed in a light most favorable to Plaintiffs, the Court concludes that a reasonable jury could find: (a) Defendants did not comport with the notice requirements pursuant to M.C.L. § 600.3220, (b) Plaintiffs had no advance

20

knowledge that the May 27, 2010 foreclosure sale would take place–or any knowledge that it had taken place before the redemption period expired, and (c) plausible Plaintiffs' belief that the foreclosure proceedings had been canceled.  Accordingly, the Court concludes that there is a genuine dispute as to material fact as to whether Defendants complied with M.C.L. § 600.3220 by providing proper notice of adjournment of the foreclosure sale.

### 2.    *Prejudice*

Defective notice of a foreclosure sale only renders that sale voidable, however, not void, and a party challenging the sale must show prejudice. *Worthy v. World Wide Fin. Servs.*, 347 F. Supp. 2d 502, 511 ( E.D. Mich. 2004); *Sweet Air Inv. Inc. v. Kenney*, 275 Mich.App. 492, 501 (2007).  The law is well-settled in Michigan that foreclosures can only be set aside if "very good reasons" exist for doing so. *Markoff*, 229 Mich. at 575.  In other words, "it would require a strong case of fraud or irregularity, or some peculiar exigency, to warrant setting a foreclosure sale aside." *Sweet Air*, 275 Mich.App. at 497 (citations and internal quotations omitted). "Statutory foreclosures are a matter of contract, authorized by the mortgagor, and ought not to be hampered by an unreasonably strict construction of the law." *Id.*

Defendants first argue that, even if Plaintiffs could show technical non-compliance with the foreclosure notices, the foreclosure could still not be set aside because Plaintiffs cannot show prejudice.  Defendants contend that: (1) there is no evidence that Plaintiffs ever tried to redeem the Property during the six-month redemption period that ended in November 2010, and (2) Plaintiffs waited to challenge the foreclosure until two months after the redemption period expired, without ever seeking a stay of the redemption period.  As discussed above, however, there is evidence that Plaintiffs were not even aware that the foreclosure sale had occurred until after the redemption

period expired.  If that is true, Plaintiffs would have had no reason to make an effort to redeem during the redemption period– nor had reason or opportunity to seek a stay of the redemption period before it expired.  For reasons set forth above and viewing the evidence in a light most favorable to Plaintiffs, Defendants' second argument–that Plaintiffs have not alleged any particular defects related to the notice of foreclosure sale–also fails.

Finally, Defendants argue that there is no evidence Plaintiffs were prejudiced because Plaintiffs "do not claim that they planned to bid at the sale and were precluded from doing so because they did [not] know about the sale" and "Plaintiffs acknowledge they did not have the funds to outbid U.S. Bank's bid of $142,000.00."  The Court finds that the evidence, again viewed in a light most favorable to Plaintiff, demonstrates that Plaintiffs have established a genuine dispute of material fact whether they were prejudiced .  First, Plaintiffs did not learn that their home had been sold at the foreclosure sale until December 2010, when they were handed a letter telling them that the house had been foreclosed upon and the redemption period had expired.

Second, as Angela Yates stated in her affidavit, she would have taken a number of steps to save the home had she known foreclosure was imminent.  As set forth therein, she would have:

(1)     contacted ASC/Defendants repeatedly to determine the status of her most recent modification application;

(2)     consulted a lawyer to learn her rights regarding the foreclosure;

(3)     insisted that Defendants allow her to resume the April 2009 loan modification;

(4)     contacted an attorney to discuss bankruptcy and other legal options; and

(5)     investigated refinancing or short sale options.

Based on the foregoing reasons, the Court finds that there is sufficient evidence in the record to create a genuine dispute of material fact as to whether Plaintiffs were prejudiced by Defendants' failure to comply with applicable foreclosure notice requirements.

> 3.    *Conclusion*

For the reasons set forth in this Section IV.D., the Court finds that there is evidence which supports a finding of "very good reasons" for setting aside the foreclosure of Plaintiffs' home, including evidence of "fraud or irregularity, or some peculiar exigency, [which would] warrant setting [the] foreclosure sale aside." *See Markoff, Sweet Air, supra.*   Accordingly, the Court concludes that Defendants' motion for summary judgment must be denied as to Plaintiffs' failure to provide proper notice claim (Count IV).

## E.    Objections to Magistrate's Order

The Court has reviewed the Magistrate's April 30, 2012 Order regarding Plaintiffs' Motion to Compel Discovery, as well as Defendants' objections thereto, Plaintiffs' response to Defendants' objections and Defendants' reply.  First, the Court notes Defendants' assertion that: "[f]or the reasons set forth in Defendants' Motion for Summary Judgement, the discovery requests addressed [in Defendants' objections] are not relevant to the adjudication of this lawsuit and therefore portions of the Magistrate's 4/30/12 Order should be reversed."  This theme was mentioned several times throughout Defendants' objections.  As the Court concluded above, however, Defendants' Motion for Summary Judgment was not persuasive with respect to dismissal of Plaintiffs' cause of action (other than Count III, which Plaintiffs acknowledged was not viable).  Likewise, the Court is not persuaded that any of the reasoning set forth in Defendants' summary judgment briefs serves as a basis for overruling any of the Magistrate's rulings set forth in the April 30, 2012, Order.

Second, with respect to the interrogatory and document requests granted by the Magistrate and now challenged by Defendants, Defendants repeatedly claim that the Magistrate failed to "recognize the attorney-client privilege."  In reviewing the Magistrate's April 30, 2012, Order, the Court notes that the Magistrate repeatedly–and consistently–ordered Defendants "to disclose all non-privileged information" with respect to the discovery requests at issue.  As such, it does not appear that the Magistrate ordered Defendants to produce privileged information.  More significantly,  in challenging the Magistrate's Order, Defendants fail to argue with any specificity what information is allegedly protected by the attorney-client privilege.  As such, the Court finds that Defendants have to satisfied their burden of demonstrating the applicability of the attorney-client privilege.

Third, the Court disagrees with Defendants' arguments that some of information sought pursuant to the interrogatory and document requests at issue is not relevant.  Rather, the Court finds that the information requested by Plaintiffs that is the subject of Defendants' objections bears directly on the central issues of this case.  For example, Defendants' contentions that: (a) the "information about the decision to proceed with foreclosure of Plaintiffs' home" are irrelevant, and (b) "the internal policies of Defendants and whether Defendants complied with those policies in dealing with [Plaintiffs'] Loan" are simply irrelevant are disingenuous.  In a case where there is evidence that Plaintiffs complied with the terms of the Plan–and, according to some courts, are therefore entitled to a permanent modification–it is very relevant to know: (1) whether Defendants complied with their own internal policies, and (2) the reasons for denying the permanent modification and proceeding with foreclosure of the home.

Fourth, Defendants argue that Plaintiffs failure to depose Defendants' representatives is the basis of the need for certain information requested by Plaintiffs and ordered by the Magistrate.  As

24

the Magistrate has since granted Plaintiffs' motion to compel deposition of Defendants' representative, the Court is not persuaded that this objection has any merit.

Accordingly, for the reasons set forth above, Defendants' Objections to the Magistrate's Order Regarding Discovery are denied.

**F.     Motion for Stay of Effect of Magistrate's Order**

As Defendants' Objections to the Magistrate's Order Regarding Discovery have been denied, the Court denies as moot Defendants' Motion for Stay of Effect of Magistrate's Order.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Docket #44) is GRANTED AS TO COUNT III and DENIED AS TO COUNTS I, II and IV.

IT IS FURTHER ORDERED that Defendants' Objections to the Magistrate's Order Regarding Discovery (Docket #45) are DENIED and Defendants' Motion for Stay of Effect of Magistrate's Order (Docket #51) is DENIED AS MOOT.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: December 10, 2012

26